IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DENNIS H. QUICK,                          )
                                          )
            Plaintiff,                    )
                                          )
      v.                                  )      Civil Action No. 12-581-LPS-CJB
                                          )
PLAYTEX MANUFACTURING, INC.,              )
and ENERGIZER PERSONAL CARE,              )
LLC,                                      )
                                          )
            Defendants.                   )

## REPORT AND RECOMMENDATION

Plaintiff Dennis H. Quick ("Quick" or "Plaintiff") filed this action against Defendants

Playtex Manufacturing, Inc. ("Playtex") and Energizer Personal Care ("Energizer") (collectively,

"Defendants"), alleging Defendants violated the Americans with Disabilities Act, 42 U.S.C. §

12101 et seq. ("ADA"), the Age Discrimination in Employment Act, 29 U.S.C. § 621, et seq.

("ADEA"), and the Family and Medical Leave Act, 28 U.S.C. § 2601 et seq. ("FMLA").

Presently pending before the Court is Defendants' Motion for Summary Judgment ("Motion").

(D.I. 30)  For the reasons set forth below, the Court recommends that the Motion be GRANTED.

## I.   BACKGROUND

### A.   Factual Background

#### 1.   Plaintiff's Employment History

Plaintiff began his employment at Playtex in December 1999.  (D.I. 1 at ¶ 15)  He was

employed in Playtex's Gentle Glide department as an electronic technician.  (D.I. 33, ex. A at 10-

11)  At the time of his separation from Playtex in June 2011, Plaintiff was 57 years old, having

been born on February 6, 1954.  (D.I. 1 at ¶ 11; D.I. 34 at 14 n.2)  As of June 2011, Plaintiff had

two supervisors:  (1) his direct supervisor, Production Superintendent Paul Hendrickson, who

was 59 years old; and (2) Senior Maintenance Manager Ed Bleistein, who was 54 years old, and

who served as Mr. Hendrickson's supervisor and a remote supervisor of Plaintiff.  (D.I. 33, ex. A

at 13-14; D.I. 32, Affidavit of Jennifer L. Schandelmeier ("Schandelmeier Aff.") at ¶¶ 11-12)

### 2.    Playtex Policies Implicated in this Matter

Playtex's relevant employee policies are set forth in its September 2009 "Hourly

Colleague Handbook[,] Dover Operations" ("Handbook").  (D.I. 32, ex. 1)  The Handbook's first

section is titled "General Policies & Procedures"; one of these is Playtex's Attendance Policy,

which includes the following definition:

> **No Call / No Show** — A Colleague who fails to report to work and
> fails to call in will be charged with 2 points of absence.  A
> Colleague, who fails to call in within [ ] one (1) hour after the start
> of their shift, will be charged with one (1) point.  Three consecutive
> days of No Call / No Show is considered a voluntary resignation.

(*Id.* at 9 (hereinafter, the "no call/no show policy"))  The Attendance Policy also includes the

following provision:

> If a Colleague is unable to come to work, it is their responsibility to
> notify their Supervisor as soon as possible, but no later than an hour
> after the start of their shift.  If they are unable to reach their
> Supervisor, they should leave a message with the Security Guard at
> [phone number] (Plant 4) or [phone number] (Walker Road Gate).

(*Id.* at 10)

The Handbook also includes a "Safety & Health" section, which contains the following

language in a subsection entitled "Fitness for Duty":

> **Returning to Work Following a Medical Leave of Absence** —
> Colleagues returning to work [] after 12 weeks of either
> occupational or non-occupational disability must be cleared by the

2

[Safety & Health Specialist] prior to returning to work and will be required to take a Fitness for Duty evaluation.

(*Id.* at 34)  The same section includes the following description of the FMLA:

> **Family Medial Leave Act (FMLA)** — The [FMLA] permits eligible regular or temporary colleagues, whether full-time or part-time, to take up to a total of twelve (12) unpaid weeks away from their jobs per 12 month period due to family, parental and medical leaves of absences.

(*Id.* at 41)

Lastly, in its "Benefits" section, the Handbook describes how Playtex employees are entitled to receive short-term disability leave, with the duration of such leave being dependant upon the employee's shift type and length of service.  (*Id.* at 44)

Plaintiff received and reviewed a copy of the Handbook and, as of September 2009, was familiar with the policies referenced above.  (D.I. 32, ex. 2; D.I. 33, ex. A at 86)

### 3.     Plaintiff's Tendinitis Surgeries

Plaintiff has undergone three surgeries for tendinitis on his elbows since 2008.

The first surgery, on Plaintiff's right elbow, occurred on or about February 11, 2008. (D.I. 33, ex. A at 35; *id.*, ex. B)  Plaintiff took leave from Playtex relating to this surgery, exhausting both his FMLA leave and then his short-term disability leave.  (*Id.*, ex. A at 73)  After receiving a "Fitness for Duty" (sometimes referred to as a "Fit for Duty", and hereafter "FFD") evaluation report, Plaintiff returned to work in July 2008.  (*Id.*, ex. B)  The only accommodation recommended by a physical therapist was that Plaintiff stretch and be permitted to take occasional rest breaks.  (*Id.* at PLAYTEX-0010)

Plaintiff's second surgery, this one on his left elbow, occurred in October 2009.  (*Id.*, ex.

3

A at 34)  Plaintiff again exhausted his FMLA leave and then his short-term disability leave, and

returned to work in March 2010 after receiving an FFD evaluation.  (*Id.* at 73; *id.*, ex. C)  No

accommodations were required.  (*Id.*, ex. C at PLAYTEX-003)

Plaintiff's third surgery, on his right elbow again, occurred in January 2011.  (*Id.*, ex. A at

34)  Again, Plaintiff exhausted his FMLA leave (which was exhausted as of March 28, 2011) and

then his short-term disability leave.  (*Id.* at 73; Schandelmeier Aff. at ¶ 13)  On May 24, 2011,

Plaintiff's treating physician informed Plaintiff that he was cleared to return to work on June 5,

2011 with no restrictions.  (D.I. 33, ex. A at 63-64; *id.* at ex. D)  Since June 5, 2011 was a

Sunday, and Plaintiff began his work week on Mondays, his effective return to work date was

June 6, 2011.  (*Id.*, ex. A at 64; D.I. 34 at 4 n.1)

### 4.     Events Leading to the End of Plaintiff's Employment

As noted above, Plaintiff was medically cleared to return to work on June 6, 2011.  On

May 31, 2011, Plaintiff spoke with Chris Byrd, the former Safety and Health Specialist with

Playtex.  (D.I. 33, ex. A at 66-67; *id.*, ex. E)  Mr. Byrd gave Plaintiff the phone number for a

health care provider, so that Plaintiff could call the provider and schedule his FFD evaluation.

(*Id.*)  Pursuant to the language in the "Fitness for Duty" subsection of the Handbook, Plaintiff

was required to successfully complete an FFD evaluation before returning to work at Playtex.

(D.I. 32, ex. 1 at 34; D.I. 35, ex. B at 11)

In the meantime, Playtex's third-party disability administrator, American General ("AG")

had been notified that Plaintiff was cleared to return to work on June 6, 2011.  (D.I. 35, ex. C at

7)  AG in turn notified Playtex of this, and Playtex's management thus expected Plaintiff to

return to work on June 6.  (*Id.*)  Plaintiff, however, did not contact the health care provider, prior

4

to June 6, in order to set up the FFD evaluation. (D.I. 33, ex. A at 68-69) And so, having not scheduled or completed the FFD evaluation, Plaintiff did not show up for work on June 6. (*Id.* at 92)

On that day, after Plaintiff did not report for work at his normal start time (3:00 p.m.), Playtex's senior Human Resources associate Gina Sullivan called AG, to see whether Plaintiff's leave had been extended. (D.I. 35, ex. C at 7; Schandelmeier Aff. at ¶ 14) Informed that it had not, Ms. Sullivan updated Plaintiff's supervisor, Mr. Hendrickson. (D.I. 35, ex. C at 7) Mr. Hendrickson then called Plaintiff at Plaintiff's home to find out why he was not at work. (*Id.*; *id.*, ex. E at 33; *see also* D.I. 33, ex. A at 92) Plaintiff states that on this call, he told Mr. Hendrickson that he had not scheduled the FFD evaluation because his mother had been ill and because his dog had recently died. (D.I. 33, ex. A at 93; *see also* D.I. 35, ex. E at 33) Plaintiff assured Mr. Hendrickson that he would call to schedule the evaluation "as soon as possible[.]" (D.I. 33, ex. A at 93) Plaintiff states that on this call, Mr. Hendrickson told Plaintiff to "keep in touch" with him. (*Id.* at 95) For his part, Mr. Hendrickson recalls telling Plaintiff that since Plaintiff had been released for duty, he had been expected at work on June 6, and that he further advised Plaintiff to "keep [him] in the loop." (D.I. 35, ex. E at 33)

On Tuesday, June 7, 2011, Plaintiff spoke with representatives at the health care provider, but was told that the soonest that the FFD evaluation could be scheduled was on Thursday, June 9, 2011, in the early afternoon. (D.I. 33, ex. A at 93-94) Plaintiff contacted an AG representative on June 7 to advise AG of the status of his FFD evaluation, but did not contact Mr. Hendrickson nor anyone else at Playtex during the time period between that day and June 9. (*Id.* at 95-96) And since he had not yet taken or passed his FFD evaluation, Plaintiff did not show up

for work at Playtex on June 7, June 8 or June 9, 2011. (*Id.* at 96-97)

On June 8, 2011, Playtex's Human Resources Director, Jennifer Schandelmeier, received an e-mail from Mr. Bleistein. In the e-mail, Mr. Bleistein informed Ms. Schandelmeier of most the events of June 6-8, 2011 summarized above, noted that Plaintiff was "not a role model employee" who "consistently year after year [was] a poor performer" and asked for guidance as to what to do.[1] (D.I. 35, ex. F) Ms. Schandelmeier wrote that "[t]omorrow at 3:00 [p.m., Plaintiff's normal start time] he's terminated if we haven't heard from him under our 3 days no call no show policy." (*Id.*)

As noted above, Plaintiff did not show up for work on June 9, 2011. At 2:56 p.m on that date, Ms. Sullivan sent an e-mail to a colleague, copying Ms. Schandelmeier, indicating that Plaintiff was "terminated effective today, June 9th." (*Id.*, ex. G at PLAYTEX-0050) At 3:35 p.m., Mr. Bleistein approved Plaintiff's termination. (*Id.*, ex. D at 31) Meanwhile, on that same afternoon, Plaintiff participated in and passed his FFD evaluation. (D.I. 33, ex. A at 94)

The next day, June 10, 2011, Ms. Schandelmeier sent Plaintiff a letter stating that Plaintiff had "failed to call into work on Tuesday 6/7/11, Wednesday 6/8/11 and Thursday,

---

[1]     Defendants cite to evidence of record indicating that Plaintiff had had a number of negative performance events during his tenure with them: that he been suspended from work on multiple occasions, had received a notation of absence in his record, had received corrective counseling and had negative performance evaluations at different points between 2002 and December 2010. (D.I. 31 at 2-3 (citing Schandelmeier Aff. at ¶ 8)) Plaintiff disputes the relevance of these record citations, in light of the fact that Plaintiff's prior disciplinary issues were not cited as a reason for his termination. (D.I. 34 at 3, 7) Defendants counter that this history is relevant "because it reflects Plaintiff's penchant for disregarding company policies that he simply did not wish to follow, such as the no call/no show policy at issue here" and "justify Defendants' vigilance with regard to Plaintiff's compliance with Defendants' policies during the period following his release to return to work as of June 5, 2011." (D.I. 36 at 5) The Court need not address this issue, as it will not take these disciplinary matters into account in resolving the instant Motion.

6

6/9/11, which makes three days of no call/no show." (D.I. 32, ex. 9) She wrote that in light of the no call/no show policy, "[a]n employee who remains absent for three consecutive days without notifying their supervisor/manager will be deemed to have terminated his/her employment" and that, in light of the events of June 7-9, "your employment with Playtex has been terminated." (*Id.*)

On the same day, June 10, the physical therapist who completed Plaintiff's FFD evaluation forwarded it by e-mail to Ms. Sullivan. (D.I. 35, ex. H) Ms. Sullivan in turn forwarded the evaluation form to Ms. Schandelmeier, along with an e-mail stating simply "OH NO[.]" (*Id.*)

Plaintiff also did not show up for work on June 10. (D.I. 33, ex. A at 51-52; 99-100) Plaintiff asserts that he had previously requested to take June 10 as a vacation day back in May 2011, but never received confirmation from a Playtex team leader, Stacey Drake, as to whether that request had been granted. (*Id.*; *see also* Schandelmeier Aff. at ¶ 10) In his deposition, Plaintiff appeared to suggest that the reason he did not report to work on June 10 was that it had "really ticked [him] off" that he had twice left messages for Mr. Drake in May 2011 regarding the vacation request, but never received a call back from Playtex as to whether the request had been granted. (D.I. 33, ex. A at 51-52; 99-100)

On June 11, 2011, Plaintiff received the termination letter from Ms. Schandelmeier. (D.I. 32, ex. 9)

## B. Procedural History

On May 9, 2012, Plaintiff filed his Complaint. (D.I. 1) On June 15, 2012, this matter was referred to the Court by Judge Leonard P. Stark to "hear and resolve all pretrial matters, up

7

to and including the resolution of case-dispositive motions[.]" (D.I. 7)

On May 7, 2013, Defendants filed the instant Motion. (D.I. 30) Defendants' Motion was fully briefed as of June 21, 2013. (D.I. 36)

## II.    STANDARD OF REVIEW

A grant of summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585 n.10 (1986). If the moving party meets this burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Id.* at 587 (internal quotation marks omitted). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). During this process, the Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

However, in order to defeat a motion for summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586-87; *see also Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks and citation omitted). The "mere existence of *some* alleged factual dispute

8

between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). Facts that could alter the outcome are "material," and a factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted). A party asserting that a fact cannot be—or, alternatively, is—genuinely disputed must support the assertion either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials"; or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B).

### III.   DISCUSSION[2]

#### A.   ADA Claim

The ADA, as amended by the ADA Amendments Act of 2008, provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . the . . . discharge of employees[.]" 42 U.S.C. § 12112(a); *see also Pierce v. Donahoe*, 963 F. Supp. 2d 366, 375 (D. Del. 2013). In the absence of direct evidence of discrimination, a

---

[2]      The parties dispute whether Defendant Energizer may properly be held responsible as Plaintiff's "employer" for purposes of any of Plaintiff's three claims. (D.I. 31 at 6-7; D.I. 34 at 8-10) The Court need not resolve this dispute, as the fact that the Court recommends granting Energizer summary judgment on all claims on alternative bases renders the issue moot.

plaintiff may prove ADA discrimination claims through the use of the familiar burden-shifting analysis developed by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Raytheon Co. v. Hernandez*, 540 U.S. 44, 50 n.3 (2003); *Pierce*, 963 F. Supp. 2d at 375.[3]

Under *McDonnell Douglas*, a plaintiff must first successfully establish a *prima facie* case of discrimination. *Raytheon Co.*, 540 U.S. at 50 n.3. If he does so, then the burden of production shifts to the defendant employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Id.* If the defendant employer can provide such a reason, the presumption of intentional discrimination disappears, but the plaintiff can still prove disparate treatment by, for instance, offering evidence that the employer's explanation is pretextual. *Id.*

To establish a *prima facie* case of discrimination under the ADA, a plaintiff must demonstrate: (1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment action as a result of discrimination. *Lescoe v. Pa. Dep't Of Corr.—SCI Frackville*, 464 F. App'x 50, 52 (3d Cir. 2012); *Gaul v. Lucent Techs. Inc.*, 134 F.3d 576, 580 (3d Cir. 1998).

### 1.    Whether Plaintiff Is a Disabled Person Under the ADA

Defendants first challenge whether Plaintiff has sufficiently established that he is a disabled person under the ADA, in order to make out the first prong of the *prima facie* case.

---

[3]        In all of the instances in this Report and Recommendation where the Court analyzes a claim under the *McDonnell Douglas* framework, the parties have agreed that this framework is applicable to the relevant claims. (D.I. 31; D.I. 34)

(D.I. 31 at 8-11) The ADA defines the term "disability" with respect to an individual, as: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment . . . ." 42 U.S.C. § 12102(1); *see also Dismore v. Seaford Sch. Dist.*, 532 F. Supp. 2d 656, 662 (D. Del. 2008).

Defendants, citing to numerous portions of the record and to various forms of case authority, assert that Plaintiff has not demonstrated that he was disabled under any of these three paths. (D.I. 31 at 8-11) Plaintiff, in response, directly addresses few if any of the arguments made by Defendants and none of the cited case law. (D.I. 34 at 12) Instead, citing to only one page in the record (a portion of Plaintiff's deposition testimony, in which he notes that his tendinitis caused him pain while working), Plaintiff concludes "it should be left to a jury to determine" whether Plaintiff's condition amounted to a disability. (*Id.* (citing D.I. 33, ex. A at 38)) Because Plaintiff appears to assert he has sufficiently established a disability under any of the three paths referenced above, the Court will analyze all three here.

> a. **Physical Impairment that Substantially Limits a Major Life Activity**

A "[p]hysical . . . impairment" under the ADA means:

> (1) Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin and endocrine[.]

29 C.F.R. § 1630.2(h)(1); *Burris v. Richards Paving, Inc.*, 461 F. Supp. 2d 244, 249 (D. Del. 2006). A physical impairment "substantially limits" a "major life activit[y]" (which includes

11

functions such as "performing manual tasks, . . . walking, standing, sitting, reaching, lifting, bending, . . . working [and] [t]he operation of a major bodily function [such as] reproductive functions[,]" 29 C.F.R. § 1630.2(i)(1)), if it "substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population[,]" *id.* § 1630.2(j)(1)(ii). *See also Burris*, 461 F. Supp. 2d at 249. The relevant determination is whether a plaintiff had a physical impairment at the time of the adverse employment decision. *Koller v. Riley Riper Hollin & Colagreco*, 850 F. Supp. 2d 502, 513 (E.D. Pa. 2012); *Rahsman v. Dewberry-Goodkind, Inc.*, Civil No. 1:05-CV-1931, 2007 WL 188571, at \*6 (M.D. Pa. Jan. 22, 2007) (citing *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 308 (3d. Cir. 1999)).

Defendants and Plaintiff both cite to Plaintiff's deposition testimony as setting out the state of the record on this issue. That testimony demonstrates the following:

- As of June 6, 2011—the date Plaintiff was cleared to return to work and just days before his employment ended—Plaintiff had "fully recovered from [his] surgeries [and] ha[d] no problems with [his] arms." (D.I. 33, ex. A at 33-34)

- Plaintiff admitted that by that time, he would not "have needed any kind of accommodation from Playtex to return to work" and that there was no reason that he could not perform "any of the essential functions of [his] job[.]" (*Id.* at 34, 40-41)

- When asked if there were any aspect of his job that he was unable to do while he was working because of his tendinitis, Plaintiff at first said the "only aspect would be heavy lifting," an example of which he defined as lifting an 800-pound motor. (*Id.* at 38-39) But Plaintiff then explained that he would not actually have been required to lift an 800-pound item by himself on the job; he instead noted that his job required lifting no more than 50 pounds. (*Id.* at 39-41, 43) And Plaintiff repeatedly confirmed that his tendinitis did not render him unable to lift items up to at least 50 pounds in weight. (*Id.* at 39-41, 43)

12

- Plaintiff acknowledged that there were no other aspects of his life, other than this impact on his ability to lift items referenced above, that were affected by his tendinitis. (*Id.* at 41)

With this as the undisputed state of the record, the Court now turns to an analysis of the relevant legal requirements. In so doing, the Court assumes that tendinitis can amount to a "physical impairment" under the ADA. *See, e.g., Harris v. Picture People*, No. 03 C 3032, 2004 WL 1898784, at *5 (N.D. Ill. Aug. 20, 2004); *Connor v. Charming Shoppes, Inc.*, No. CIV. A. 96-5481, 1996 WL 668545, at *1 (E.D. Pa. Nov. 12, 1996).

Yet the record could not support a conclusion that, at the time of his termination, Plaintiff suffered from a disability related to his tendinitis. Plaintiff's own testimony establishes that by June 6, 2011, he had "fully recovered" from his tendinitis surgeries and had "no problems" with his arms. To the extent his tendinitis had any impact on him, Plaintiff appears to indicate that this had manifested as arm pain and lifting limitations that had occurred in the past. (D.I. 33, ex. A at 38, 44-45; *see also id.*, ex. F at 7 (Plaintiff noting in December 2011 that his tendinitis "no longer exists"))

Moreover, in his answering brief, Plaintiff never specifies the major life activity or activities that he asserts have been substantially limited by his claimed disability. In an EEOC "A.D.A. Questionnaire" that Plaintiff filled out in December 2011 ("EEOC Questionnaire"), Plaintiff identified two major life activities that he asserted were impacted by his tendinitis: "Lifting" and "Reproduction[.]" (D.I. 33, ex. F at 1) The Court will focus on the first of those here.[4] Even were the Court to assume that Plaintiff's deposition testimony meant to convey that

---

[4] In his deposition, Plaintiff was asked about the reference to "Reproduction." (D.I. 33, ex. A at 43) He explained that by that reference, he meant to indicate that after his tendinitis surgeries it could take up to nine months for his tendons to completely heal (and confirmed that,

13

he was limited in his ability to lift at the time of his termination, the record could not support a conclusion that Plaintiff was "substantially limited" in that ability.

As noted above, in his testimony, Plaintiff repeatedly confirmed that after he recovered from surgery, at no point did his tendinitis impact his ability to lift up to 50 pounds of weight.[5] Yet in *Marinelli v. City of Erie, Pa.*, 216 F.3d 354, 364 (3d Cir. 2000), the United States Court of Appeals for the Third Circuit explained that various courts had rejected ADA claims of disability where the evidence indicated only that a plaintiff was unable to lift 25 pounds or more. Citing to those other courts in support, the *Marinelli* Court found that the district court had erred in denying the defendant's motion for judgment as a matter of law, by finding that the plaintiff introduced evidence that he was "disabled" under the meaning of the ADA. *Id.* at 359, 364. The Third Circuit ruled that even where there was record testimony that the plaintiff's claimed disability limited his ability to lift items over ten pounds—a limit "not far removed from the twenty-five pound restrictions our sister circuits have held not to render one disabled under the ADA"—this would be insufficient to support a claim of substantial limitation in one's ability to lift. *Id.* at 364. After *Marinelli*, and both before and after the ADA Amendments Act of 2008,

_____

by the time of his deposition, he considered those tendons to have fully healed). (*Id.*) For these reasons, the Court does not understand the reference in the EEOC Questionnaire to "Reproduction" as an assertion that Plaintiff was substantially limited in the "major bodily function" of "reproductive functions." 29 C.F.R. § 1630.2(i). Indeed, the fact that Plaintiff's focus is solely on the major life activity of "lifting" is clear from his deposition testimony, where the only reference he makes to being limited by his tendinitis was to the ability to lift certain (very heavy) items. (*See* D.I. 33, ex. A at 43-44)

[5]   Indeed, in the December 2011 EEOC Questionnaire, after identifying "Lifting" as a major life activity affected by his tendinitis, Plaintiff wrote in the word "HEAVY" after "Lifting[.]" (D.I. 33, ex. F at 1) Plaintiff confirmed that in doing so, he meant that he was limited in his ability to lift items of a weight "[s]ome figure over 50 pounds[.]" (*Id.*, ex. A at 43)

the Third Circuit and other courts have found that lifting restrictions well below those at issue

here were insufficient to support an ADA disability claim.[6] Indeed, as to the exact circumstances

at play in this case—a plaintiff who claims an inability to lift no less than 50 pounds in support

of his ADA-based disability claim—district courts in this Circuit have held that such claims

cannot advance past the summary judgment stage.[7] In line with this precedent, which is

understandable and consistent with the ADA's definition of "disability," the Court finds that

Plaintiff cannot establish that he had a physical impairment that substantially limits one or more

major life activities at the time of his termination.

---

[6]     *See, e.g.*, *Lander v. ABF Freight Sys., Inc.*, 459 F. App'x 89, 90-92 (3d Cir. 2012)
(upholding district court's grant of summary judgment to defendant, where plaintiff could not
establish that his claimed disability impacted his ability to lift less than 40 pounds, and noting in
part that such restrictions "considerably exceeded what constitutes a substantial limitation on a
major life activity") (citing *Marinelli*, 216 F.3d at 364); *Cella v. Villanova Univ.*, 113 F. App'x
454, 455 (3d Cir. 2004) ("[Plaintiff's] doctors put him on restriction from lifting over ten pounds
for a period of time, but we have previously held that this kind of limitation alone does not
establish that the impairment substantially limits a major life activity."); *see also Riley v. Potter*,
Civil Action No. 08-5167 (SDW)(MCA), 2011 WL 3841530, at *8-9 (D.N.J. Aug. 25, 2011)
(granting the defendants' motion for summary judgment and holding that plaintiff was not
disabled under 42 U.S.C. § 12102(1)(A) where his claimed disability restricted him from
"repetitive lifting" of over 25 pounds and lifting of up to 44 pounds more than three times per
hour) (citing *Marinelli* and other cases) (internal quotation marks omitted).

[7]     *See, e.g.*, *Siegfried v. Lehigh Valley Dairies, Inc.*, No. 02-cv-2951, 2003 WL
23471747, at *1 (E.D. Pa. Oct. 29, 2003) (finding summary judgment in defendant's favor
appropriate on the ground that plaintiff could not demonstrate that he was substantially limited in
the major life activity of lifting, where the record indicated that plaintiff retained ability to lift
objects weighing up to 50 pounds to shoulder height) (citing *Marinelli*, 216 F.3d at 363);
*Mondzelewski v. Pathmark Stores, Inc.*, 976 F. Supp. 277, 280 (D. Del. 1997) (granting summary
judgment to defendant on this ground, because "courts seem to agree lifting restrictions of 25
pounds or more are not significant" and finding that plaintiff's limitation on lifting 50 pounds or
more due to a back injury "clearly falls on the side of an insubstantial lifting restriction when
compared with the general population"), *rev'd on other grounds*, 162 F.3d 778 (3d Cir. 1998);
*Jacoby v. Arkema Inc.*, Civil Action No. 06-2339, 2007 WL 2955593, at *9 (E.D. Pa. Oct. 9,
2007) ("[A] lifting restriction of fifty pounds does not constitute a substantial limitation on the
ability to lift.") (citing *Marinelli*, 216 F.3d at 364).

### b.    Record of Impairment

In order to establish a record of impairment, a plaintiff must show "a history of, or [having] been misclassified as having," a substantially limiting impairment. 29 C.F.R. § 1630.2(k)(1). A plaintiff attempting to prove the existence of a "record" of disability must, in the first place, demonstrate that the recorded impairment is in fact a "disability" within the meaning of the ADA. *Dismore*, 532 F. Supp. 2d at 663-64 (citing cases); 29 C.F.R. § 1630.2(k)(2). The relevant regulations, however, instruct that the question of "[w]hether an individual has a record of impairment" is one that must be "construed broadly to the maximum extent permitted by the ADA[.]" 29 C.F.R. § 1630.2(k)(2).

Plaintiff appears to assert that his "three separate surgeries over a three-year period" and his "time out of work for recovery" are evidence "establish[ing] a record of [ ] impairment[.]" (D.I. 34 at 12) The record does demonstrate that Plaintiff has undergone three surgeries for tendinitis on his elbows since 2008. (D.I. 33, ex. A at 34-35) For each of the three surgeries, Plaintiff took leave from Playtex relating to that surgery, for a period of between four and six months. (*Id.*, ex. A at 34-35, 73; *id.*, exs. B & C) There is no dispute that Defendants were aware of Plaintiff's repeated surgeries and the post-surgical recovery periods that followed. (*See id.*, ex. F at 4 (EEOC Questionnaire stating that "the three surgeries [were] coordinated through [Defendants'] health specialist[,]" and that "management officials . . . knew the surgeries would require longer healing periods"))

The record is less clear, however, as to what Plaintiff's medical status was during the three periods of surgery-related leave, or how his ability to lift was impacted during those time periods. The Court could reasonably infer that, during these periods, Plaintiff was not able to

16

meet the demands of his employment (otherwise, presumably, he would not have needed to be on leave from work in the first place), including the requirement that he be able to lift up to 50 pounds.[8]  (D.I. 33, ex. A at 39)

Nevertheless, even drawing all inferences in Plaintiff's favor and construing "record of impairment" broadly, the Court cannot conclude that Plaintiff has sufficiently established a record of impairment relating to any or all of these periods of post-surgical leave.  The only clear inference the Court can make as to Plaintiff's lifting ability in these time frames is that he was incapable of lifting 50 pounds.  But the relevant question here is whether his lifting limitations constituted a disability under Third Circuit case law—precedent that, as noted earlier, has rejected a claim of disability based on a plaintiff's inability to lift over ten pounds.  *See Marinelli*, 216 F.3d at 364.  In his briefing, Plaintiff points the Court to no evidence setting out how limited he was in his ability to lift during any of these post-surgical time periods, nor how

---

[8]       Defendants note Plaintiff's testimony indicating that he was able to perform all essential job requirements upon returning to work in 2008 and 2010, and that he would have been able to do so had he returned in June 2011.  (D.I. 31 at 9 (citing D.I. 33, ex. A at 40-41, 45))  Then, citing to *Butler v. BTC Foods Inc.*, Civil Action No. 12-492, 2012 WL 5315034, at *3 (E.D. Pa. Oct. 19, 2012), Defendants argue in a footnote that the "mere fact that an employee is unable to work for a period after recovering from surgery does not necessarily support the finding that [he] has a 'physical impairment that substantially limits one or more major life activities.'"  (D.I. 31 at 9 n.6)  This is so, but it is also the case that the temporary nature of a plaintiff's limitations do not preclude a claim that the plaintiff was disabled during a period of post-surgical recovery.  *See Bush v. Donahoe*, — F. Supp. 2d —, Civil Action No. 11-1287, 2013 WL 4045785, at *12 (W.D. Pa. Aug. 8, 2013) ("Neither the statutes nor the EEOC regulations contain a duration requirement for determining whether an individual meets the definition of a disability . . . [r]ather, duration is but one factor the Court takes into consideration in determining whether a major life activity is substantially limited by the impairment.") (internal citations omitted).

long within those time periods any such limitations lasted.[9]  In the absence of citation to any such

evidence, the Court cannot reasonably infer that the nature of Plaintiff's lifting limitations were

significant enough or long-lasting enough to satisfy the requirements for demonstrating a record

of impairment.

### c.  Being "Regarded As" Having Such an Impairment

Lastly, under the ADA, an individual meets the requirement of "being regarded as having

such an impairment" if "the individual establishes that he or she has been subjected to an action

prohibited under this chapter because of an actual or perceived physical or mental impairment

whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. §

12102(3)(A) (internal quotation marks omitted); *see also* 29 C.F.R. § 1630.2(g)(1)(iii).  The

analysis on this claim focuses then not on Plaintiff and his actual abilities, but rather on the

reactions and perceptions of the persons interacting or working with him.  *Kelly v. Drexel Univ.*,

94 F.3d 102, 108-09 (citing 2 *EEOC Compliance Manual*, § 902, at 902-3 to 902-4).

Again here, it is worth noting that Plaintiff, in his answering brief, cites to no facts of

record in support of his claim that Defendants regarded him as disabled.  He says only that a jury

should be permitted to decide "whether Defendant regarded him as disabled due to his repeated

---

[9]       On its own, the Court has examined the record in this regard.  Although Plaintiff
does not cite to it, the strongest support in the record that Plaintiff was limited in his lifting
ability during his post-surgical recovery periods comes from his deposition, when he stated (in
reference to his surgeries and the recovery that followed), "once [doctors] cut those tendons, you
have no energy in your arms, you have to build it up again [by] lift[ing] weights and get[ting your
arms] back up to where the need to be." (D.I. 33, ex. A at 43-44)  Even assuming that, at some
point in these periods, Plaintiff was unable to do any lifting, the question would remain how long
he remained in that condition. *See Bush*, 2013 WL 4045785, at *12.  Without any information
regarding the length of such a condition, there are insufficient facts of record for the Court to
reasonably infer that Plaintiff's limitations in these time periods could qualify as a disability.

18

periods of medical leave as a result of the need to correct [his tendinitis]." (D.I. 34 at 12)

The only portions of the record that appear to address this type of "regarded as" claim were highlighted by Defendants. (D.I. 31 at 10-11) They note that in Plaintiff's EEOC Questionnaire, when asked the basis for his claim that Defendants incorrectly perceived or regarded him as disabled, Plaintiff wrote that he thought he was perceived as having "[p]ossibly tendonitis of all major body joints[; for example] legs, knee joints" but also wrote that "[t]his is just a thought" and that "I have nothing [on which] to base my opinion." (D.I. 33, ex. F at 6) When asked about this claim at his deposition, Plaintiff said that he "thought that maybe the people that knew me or knew of my problem thought that I had tendonitis in my other joints" and "that's why I thought it was perceived as me having other problems and needing to be away from the company longer to take care of other joints [that have] never needed surgery." (*Id.*, ex. A at 45-46) Plaintiff went on to confirm in his deposition that he had not, in fact, suffered from tendinitis in any joints other than his elbows, and that he had no evidence indicating that any other person working for Defendants—let alone any of Defendants' management employees who played a role in his termination—actually perceived him to have such a condition. (*Id.* at 46-48) Nor did Plaintiff put forward any other explanation as to how Defendants otherwise perceived him to have a disability (even if he, in fact, did not have one). (*Id.*)[10]

The Court agrees then with Defendants that what there is of this type of claim is premised only on Plaintiff's unsupported "speculation" as to what Defendants' employees might have been

---

[10]     As to the assertion in Plaintiff's answering brief that Defendants may have regarded him as disabled due to his "repeated periods of medical leave as a result of the need to correct" his tendinitis, again, Plaintiff cites to no evidence of record indicating that Defendants (let alone Defendants' management) harbored such a belief.

thinking about how his tendinitis had affected him. (D.I. 31 at 10) As the Third Circuit and

other courts have held, a plaintiff cannot withstand summary judgment when his own

"speculative perception" that a defendant's supervisors treated him poorly due to a perceived

disability is backed up by no other concrete evidence of record. *See Keyes v. Catholic Charities

of the Archdiocese of Phila.*, 415 F. App'x 405, 410 (3d Cir. 2011); *see also Nawrot v. CPC

Int'l*, 277 F.3d 896, 903 n.1 (7th Cir. 2002) (finding that plaintiff had not presented sufficient

evidence to withstand summary judgment on the ground that defendant employer regarded him as

disabled, where plaintiff "merely speculate[d]" that defendant misperceived him as being

disabled); *Curry v. Cyprian Ctr.*, 17 F. App'x 339, 340-41 (6th Cir. 2001) (same). For this

reason, Plaintiff cannot sufficiently demonstrate that he was "regarded as" having an impairment

by Defendants.

### 2.    Pretext

Even assuming Plaintiff were able to demonstrate that he is disabled (which he cannot),

and even assuming that the evidence the Court is about to discuss was sufficient to satisfy the

third prong of the *prima facie* case,[11] the Court would nevertheless find that Plaintiff has not put

forward sufficient facts to demonstrate that Defendants' legitimate, non-discriminatory

explanation for his termination (his violation of the no call/no show policy) was pretextual.

Plaintiff's assertion that there *are* sufficient facts of record to demonstrate pretext boils

down to a single argument: that these facts suggest that "[r]ather than following their own

policies, Defendants terminated Plaintiff under the pretext that he violated [their] three-day no

---

[11]    The second prong of the *prima facie* case—that Plaintiff was otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer—does not appear to be in dispute.

call/no show policy[.]" (D.I. 34 at 2; *see also id.* at 12-13)  This is really the nub of his claim and

of the parties' dispute, and it implicates the parties' different versions of how to interpret what

led to Plaintiff's termination.

According to Plaintiff, although his doctor released him to return to work on June 6,

2011, the Handbook makes clear that he first had to take and pass an FFD evaluation.  (D.I. 34 at

4)  He acknowledges that he did not take that evaluation until June 9, three days after he was

medically cleared to return to work (asserting that this was due to family and personal issues).

(*Id.* at 5)  But according to Plaintiff, his *delay* in taking the FFD evaluation is of no moment.  (*Id.*

at 17)  He argues that pursuant to the Handbook, Defendants had no right to start the "three-day .

. . timeframe" regarding the no call/no show policy (which states that an employee is charged

with a violation if they do not report or call in by one hour after the start of their shift, and that

three consecutive days' worth of violations will constitute a voluntary termination) until after

Plaintiff *actually* completed the evaluation.  (*Id.*)  Therefore, according to this logic, since

Plaintiff did not actually take and pass an FFD evaluation until June 9, 2011, Plaintiff "should

not have been terminated until June 12, 2011 at 4:00 p.m."  (*Id.* at 5-7, 16-17)

Defendants take a different view of the facts and their meaning.  In their view, once

Plaintiff was cleared to return to work on June 6, that was the date by which they were entitled to

start the three-day no call/no show clock (assuming Plaintiff did not show up for work on that

date).  (D.I. 36 at 4)  Indeed, Defendants claim that they gave Plaintiff a break—that although

they could have "begun counting days of no call/no show" on June 6, they "gave Plaintiff an

additional day to comply with company policy" by only beginning to count his absence/violations

on June 7 instead.  (*Id.*)  Defendants argue that although the Handbook does require that an

employee obtain an FFD evaluation prior to returning to work, the employee needs to schedule and complete that evaluation on or before the date when he is cleared to return.[12] (*Id*. at 4-5) In other words, the Fitness for Duty subsection of the Handbook does not permit an employee to delay the scheduling of the FFD evaluation and to do so "at his leisure"—even long after he is medically cleared to return to work—and yet hamstring Defendants by precluding them from "terminat[ing an employee's] employment until he had passed the FFD [evaluation] and failed to show up for work when scheduled." (*Id*. at 5 n.1)

Plaintiff, for his part, replies that even if this is how Defendants interpreted their own policies, they nevertheless failed to follow that interpretation here. He claims this is evidenced by the fact that Ms. Sullivan, Defendants' senior Human Resources associate, sent an e-mail indicating that Plaintiff was terminated at 2:56 p.m. on June 9 and that Mr. Bleistein approved his termination at 3:35 p.m. on that date. (D.I. 34 at 16-17) Thus, according to Plaintiff, since he was fired *before* the no call/no show deadline on June 9 (i.e., before 4:00 p.m., one hour after his daily start time on that day), this indicates that the "decision to terminate Plaintiff had nothing to do with the . . . no call/no show policy." (*Id*.)

At the summary judgment stage, the Court is required to draw all reasonable inferences in favor of the nonmoving party, and may not make credibility determinations or weigh the evidence. Thus, for purposes of this Report and Recommendation, the Court will view the disputed facts (or the inferences to be drawn from those facts) regarding the proper meaning and

---

[12]     Indeed, according to Defendants, every other of their employees who has ever taken medical leave, save Plaintiff, has in fact completed their FFD evaluations before their return to work date. (*See* D.I. 35, ex. B at 32-33 (Ms. Sullivan testifying that Defendants had always expected the FFD evaluation to be completed before an employee's anticipated return to work date, and that she could recall no other employee who had failed to do so))

implementation of Defendants' policies through Plaintiff's lens.[13]

But after careful consideration, the Court does not believe that these facts are sufficient for a reasonable jury to conclude, by a preponderance of the evidence, that Defendants' explanation for Plaintiff's termination is a pretext for discrimination. In order to make out a showing of pretext, the "plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994); *see also Mease v. Wilmington Trust Co.*, 726 F. Supp. 2d 429, 437 (D. Del. 2010). Rather, he must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence[,] and hence infer that the employer did not act for [the asserted] non-discriminatory reason[]." *Fuentes*, 32 F.3d at 765 (internal quotation marks and citation omitted); *see also Mease*, 726 F.

---

[13]     The Court agrees that, taken to its extreme, Plaintiff's interpretation of the proper application of the Handbook is not a reasonable inference. That is, it would not be reasonable to infer on these facts that, pursuant to the Handbook's terms, Defendants' employees on medical leave otherwise cleared to return to work could postpone that return and insulate themselves from termination by simply deciding not to schedule an FFD evaluation for weeks or months (or years). But the Court notes that here, the date of the FFD evaluation and the date that Plaintiff was cleared to return to work were fairly close in time. In the context of that more narrow time window, it is less clear how (1) the requirement to schedule an FFD evaluation, (2) the date an employee on medical leave is cleared to return to work, and (3) the start of the no call/no show policy's three-day window, should all marry together. Indeed, in this case, Defendants did not start the no call/no show clock running until one day after Plaintiff was medically cleared to return; it could be a reasonable inference that they did so not simply out of charity, but because under the circumstances, it was appropriate to do so under the terms of their policies.

23

Supp. 2d at 437.[14]

Here, even if Plaintiff is correct and the Handbook's policies (including the no call/no show policy) should have been read under these circumstances to permit him until June 12 before termination, the record evidence consistently demonstrates that Defendants *believed* otherwise—that the policy would be violated if Plaintiff did not report or call in by no later than 3:00 p.m. on June 9. This is evidenced by Ms. Schandelmeier's June 8, 2011 e-mail, in which she wrote that "[t]omorrow at 3:00 [p.m., Plaintiff's normal start time] he's terminated if we haven't heard from him under our 3 days no call no show policy." (D.I. 35, ex. F) This e-mail establishes that Defendants *believed* that termination would be proper pursuant to the policy on June 9, and that the policy's three-day clock would have run by 3:00 p.m. on that date. So too does the June 9 e-mail sent by Ms. Sullivan about Plaintiff's termination at 2:56 p.m., and the fact that Mr. Bleistein approved the termination just after 3:30 p.m. (D.I. 35, ex. G at PLAYTEX-0050; D.I. 35, ex. D at 31) And further confirmation comes from the termination letter that Ms. Schandelmeier sent Plaintiff on June 10, which stated, in relevant part: "you failed to call into work on Tuesday 6/7/11, Wednesday 6/8/11 and Thursday, 6/9/11, which makes three days of no call/no show." (D.I. 32, ex. 9)

---

[14]    For this reason, it is well-established a court may not "second-guess a company's business judgment or decisional process"; the inquiry here, instead, is whether the asserted rationale for termination is so implausible that it is "unworthy of credence." *See Garvin v. Progressive Cas. Ins. Co.*, No. 5:08-cv-3758, 2010 WL 1948593, at *7 (E.D. Pa. May 10, 2010) (rejecting plaintiff's argument that decision maker's failure to review all of the documentation surrounding investigation prior to terminating plaintiff could establish pretext); *cf. Ashley v. Bayhealth Med. Ctr., Inc.*, 869 F. Supp. 2d 544, 555 (D. Del. 2012) ("[T]he ADEA has not transformed courts into 'super-personnel department[s] that reexamine[] entities' business decisions.'") (quoting *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 332 (3d Cir. 1995)).

At most, Plaintiff is left to argue that because Ms. Sullivan and Mr. Bleistein were discussing and confirming Plaintiff's termination within about an hour or so before the no call/no show clock actually *should* have run out (i.e., at 4:00 p.m. on June 9, one hour after Plaintiff's official start time on that date), Defendants' assertion that the policy's violation was the trigger for termination is a falsehood. (D.I. 34 at 13)[15] The Court simply does not believe that this asserted inconsistency, standing alone, is sufficient to render "the evidence . . . such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Ultimately, the Court agrees with Defendants that, at worst, a reasonable jury could find not that Defendants acted out of discriminatory animus, but instead "acted hastily in applying the no call/no show policy . . . in order to terminate the employment of a non-compliant employee." (D.I. 36 at 7)

---

[15]     Plaintiff cites to no other compelling record evidence that would demonstrate pretext. He does make three other arguments as to how the record might suggest pretext, but the relevant portions of the record either do not support the cited propositions, or are at best unclear. For example, Plaintiff first asserts that "[Mr.] Bleistein has admitted that Plaintiff was allowed until 4:00 p.m. on Thursday, 6/9/11, to call in without being a no show for that day[.]" (D.I. 34 at 13 (citing D.I. 35, ex. D)) The cited portion of Mr. Bleistein's deposition contains no such admission, and certainly does not address what Mr. Bleistein (or any other of Defendants' employees) were thinking as of June 8 and 9, 2011. (*See* D.I. 35, ex. D at 36) Second, Plaintiff asserts that Ms. Sullivan's June 10, 2011 e-mail forwarding Plaintiff's FFD evaluation and stating simply "OH NO[,]" (D.I. 35, ex. H), clearly "connotes a voluntary and knowing violation of Defendants' own policies." (D.I. 34 at 17) The Court disagrees, and finds that the meaning of this statement is unclear, and, in any event, falls well short of an admission that Defendants violated their policies. Finally, Plaintiff argues that "had Defendants truly made an innocent mistake in terminating Plaintiff[,]" then he "should have [been] hired [ ] back" once they received his FFD evaluation. (*Id.*) While Plaintiff's argument might carry some weight if consistent with the record evidence, Defendants actually do not (and did not at the time of Plaintiff's termination) admit that they were mistaken in applying the no show/no call policy to terminate Plaintiff. (*See, e.g.*, D.I. 36 at 4 ("[Plaintiff] ignores, however, the fact that Defendants could have begun counting days of no call/no show when Plaintiff failed to return to work on June 6, 2011. Instead, Defendants gave Plaintiff an additional day to comply with company policy, which he failed to do . . . ."); D.I. 32, ex. 9)

As Plaintiff has not pointed to sufficient evidence to demonstrate that Defendants' proffered non-discriminatory explanation was a pretext for discrimination, the Court therefore also recommends the grant of summary judgment as to the ADA claim on this alternative ground.

**B.     ADEA Claim**

**1.     Legal Standard**

Next the Court turns to Plaintiff's ADEA claim. The ADEA makes it "unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age[.]" 29 U.S.C. § 623(a). In the absence of direct evidence of discrimination, a plaintiff may prove age discrimination through the *McDonnell Douglas* burden-shifting analysis set out above. *Smith v. City of Allentown*, 589 F.3d 684, 691 (3d Cir. 2009); *Bowman v. U.S. Dep't of Agriculture*, Civ. No. 10-00493-LPS, 2013 WL 1291622, at *2 (D. Del. Mar. 28, 2013).

To establish a *prima facie* case of age discrimination, a plaintiff must show: (1) he is forty years of age or older; (2) the defendant took an adverse employment action against him; (3) he is qualified for the position; and (4) he was ultimately replaced by another employee who was sufficiently younger to support an inference of discriminatory animus. *Bowman*, 2013 WL 1291622, at *2; *Ashley v. Bayhealth Med. Ctr., Inc.*, 869 F. Supp. 2d 544, 551 (D. Del. 2012). While the above-stated form of *prima facie* case is ordinarily applicable to ADEA claims, rigid adherence to a specific form of *prima facie* proof has been eschewed by the Supreme Court and by the Third Circuit. *Ashley*, 869 F. Supp. 2d at 551 (citing cases). Accordingly, "'the precise elements of a plaintiff's prima facie case may vary with the particular circumstances' of a case." *Id.* at 552 (quoting *Waldron v. SL Indus., Inc.*, 56 F.3d 491, 494 (3d Cir. 1995)).

With regard to the fourth element here, it is undisputed that Plaintiff was *not* replaced by

a younger employee—indeed, Plaintiff's position was not filled by anyone.  (Schandelmeier Aff.

at ¶ 21)  In such a circumstance, our Court has explained:

> [A] more generic fourth element is appropriate.  Specifically, a
> showing that the circumstances of the adverse employment action
> gives rise to an inference of age discrimination would be sufficient
> to satisfy the fourth element of a prima facie case. . . . A common
> circumstance[] giving rise to an inference of unlawful
> discrimination . . . [is] the more favorable treatment of similarly
> situated colleagues outside of the relevant class. . . . Ultimately,
> plaintiff's evidentiary burden at [the *prima facie*] stage is rather
> modest:  it is to demonstrate to the court that the plaintiff's factual
> scenario is compatible with discriminatory intent—i.e., that
> discrimination could be a reason for the employer's action.

*Ashley*, 869 F. Supp. 2d at 552 (internal quotation marks and citations omitted).[16]

If Plaintiff meets his burden as to his *prima facie* case, Defendants must then come

forward with a legitimate, non-discriminatory reason for Plaintiff's termination (here, the alleged

violation of the no call/no show policy).  *Bowman*, 2013 WL 1291622, at *3.  The plaintiff then

carries the burden of proving that this reason was a pretext for discrimination.  *Bowman*, 2013

WL 1291622, at *3.  In order to show pretext in an ADEA case, Plaintiff must point to some

evidence, direct or circumstantial, from which a factfinder could reasonably either:  (1)

disbelieve the employer's articulated legitimate reasons; or (2) conclude that discrimination was

---

[16]    *See also Johnson v. St. Luke's Hosp.*, Civil Action No. 06-3417, 2007 WL
3119845, at *5 (E.D. Pa. Oct. 23, 2007) (noting that to meet this fourth element, a plaintiff must
establish "'some causal nexus between [his] membership in a protected class and the decision to
[terminate his employment].'") (quoting *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 798 (3d Cir.
2003)); *Bullock v. Children's Hosp. of Phila.*, 71 F. Supp. 2d 482, 489 (E.D. Pa. 1999) (finding
that a plaintiff can satisfy this element by demonstrating "generally that he . . . was . . . fired
under circumstances that give rise to an inference of unlawful discrimination.") (citing *Pivirotto
v. Innovative Sys., Inc.*, 191 F.3d 344, 357 (3d Cir. 1999)).

more likely than not a "but for" cause of the employment action. *Abels v. DISH Network Serv.,*

*LLC*, 507 F. App'x 179, 183 (3d Cir. 2012); *Fuentes*, 32 F.3d at 764; *Cridland v. Kmart Corp.*,

929 F. Supp. 2d 377, 384-85 (E.D. Pa. 2013). "Regardless of the method, the plaintiff's evidence

must allow a reasonable jury to find, by a preponderance of the evidence, that age discrimination

was a 'but for' cause" of the termination. *Abels*, 507 F. App'x at 183; *see also Cridland*, 929 F.

Supp. 2d at 384-85.[17]

### 2.    Analysis

For purposes of the present motion, the parties do not dispute that Plaintiff can establish

the first three elements of the *prima facie* case, in that Plaintiff is over 40 years old, was qualified

for his position, and was terminated. Defendants contest, however, that Plaintiff has sufficiently

established the fourth element, and that, even if he could, that he has sufficiently demonstrated

pretext. (D.I. 31 at 13-17; D.I. 36 at 5-9)

As to the fourth element, Plaintiff does not seek to satisfy it by asserting that a similarly

---

[17]     The Third Circuit has endorsed the continued use of the *McDonnell Douglas* framework as as ADEA claims, even after the Supreme Court's decision in *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009). *Gross* is the case that required that a plaintiff seeking to recover under a disparate treatment age discrimination theory must prove by a preponderance of the evidence that age was the "but for" cause of the challenged employment action. *Smith*, 589 F.3d at 690-91; *Ashley*, 869 F. Supp. 2d at 551 n.7. The Third Circuit has explained that *Gross* stands for the proposition that it is improper to shift the burden of persuasion (including the burden of proving "but for" causation) to the defendant in an age discrimination case; it has found, however, that *McDonnell Douglas* does not do this, and instead shifts only the burden of production between the plaintiff and employer at each of its three stages. *Smith*, 589 F.3d at 691; *Ashley*, 869 F. Supp. 2d at 551 n.7. Moreover, despite *Gross*' "but for cause" requirement, at least one district court in this Circuit has found that, at the summary judgment stage at least, a plaintiff can assert alternate claims of discrimination based on age and on some other characteristic or factor. *See DeAngelo v. DentalEZ, Inc.*, 738 F. Supp. 2d 572, 578-79 (E.D. Pa. 2010). The law outside the Circuit is not uniform on this point, *id.*, but for purposes of resolving this Motion, the Court will assume that Plaintiff can press both his ADEA claim and other claims here in opposing summary judgment.

situated colleague was treated more favorably than him. (D.I. 34 at 15)  Instead, he largely points

to portions of his deposition testimony for support.  This testimony, according to Plaintiff,

demonstrates how he heard that "older employees [of Defendants] who took disability and

FMLA leave ended up being terminated." (*Id*.)  In the particular portions of that cited testimony,

Plaintiff states the following:

- That a fellow electronic technician once told Plaintiff in December 2010 that it was the technician's "opinion" that "after you have so many surgeries or have so much leave that you are gone."

- Another of Defendants' electricians was "let go around 2010" and had a "condition [that] wasn't cleared up by the time he had to return to work."  Plaintiff stated that he did not know the man's last name or how many leaves of absence he had taken, and admitted that while the above was his "understanding" of events related to the man, he "d[idn']t know" the man's particular circumstances because "[n]obody ever tells anybody anything at Playtex."

- In or around 2008, a machine operator in the Gentle Glide department, whose name Plaintiff did not recall but who he described as a "lady who was taking care of her mother with FMLA," was "let go" after using significant leave time.

- "[A]nother girl[,]" whose last name Plaintiff did not remember, "did have leave time" and was terminated, then "took Playtex to court and . . . won[,]" returned to Playtex, and later left the company. Plaintiff acknowledged that he "was not sure of the situation" with this woman, that he could not remember why she was terminated, and when asked if she had a "medical issue" said "I think so."

- In response to a question about why he felt that he was discriminated against for using *FMLA leave*, Plaintiff cited generally to his "[p]rior experience, watching other people get terminated and not come back from their medical leave . . . or their parents' medical leave or for, like, parents with cancer, that kind of issue."

(D.I. 35, ex. J at 54-57, 74 (cited in D.I. 34 at 15); *see also* D.I. 33, ex. A at 48)

At least some portion of this information is arguably based on inadmissible hearsay evidence (i.e., what others told Plaintiff, which Plaintiff intends to offer for its truth here and at trial); as a result, the Court has some doubt as to whether such information could be used to satisfy Plaintiff's burden.[18] Beyond that, nearly all of this testimony is so vague, and based on such a tenuous factual foundation, that it would be hard to credit it for any purpose.[19] And perhaps most significantly, none of Plaintiff's statements above make any reference to the *age* of these referenced individuals, or include content that clearly suggests that the individuals in question were treated inappropriately based on their *age*. *See Bhaya v. Westinghouse Elec. Corp.*, 922 F.2d 184, 187-88 (3d Cir. 1990) (testimony that "terminating the [plaintiffs] might violate 'the labor laws of their contract'" was found to "lack[ ] any appreciable link to age discrimination or the ADEA"); *Thrower v. Home Depot, Inc.*, No. Civ.A. 04-577, 2005 WL 2367763, at *9 (W.D. Pa. Sept. 27, 2005) (statements that the plaintiff lacked "energy" or "fire"

---

[18]     *See, e.g., Tillman v. Pepsi Bottling Grp.*, 538 F. Supp. 2d 754, 781 (D. Del. 2008) (noting that hearsay statements may only be considered in the summary judgment context when they would be admissible at trial); *see also Laymon v. Lobby House, Inc.*, C.A. No. 07-129-MPT, 2008 WL 1733354, at *5 (D. Del. Apr. 14, 2008) (failing to credit inadmissible hearsay when considering evidence proffered to defeat summary judgment motion).

[19]     *See, e.g., Mitchell v. USB Servs. USA LLC*, Civ. Action No. 07-1651 (KSH), 2009 WL 1856630, at *11 (D.N.J. June 26, 2009) (finding that where plaintiff could not "recall anything specific" that a supervisor said at a key meeting, but instead relied on "[v]ague claims" about the supervisor's conduct, this was insufficient to demonstrate pretext in an age discrimination case); *Anderson v. McIntosh Inn*, 295 F. Supp. 2d 412, 421 (D. Del. 2003) (finding that plaintiff could not establish pretext in race discrimination case where his "evidence consists of general allegations of Defendant's discriminatory motives based on hearsay and personal beliefs not predicated on actual knowledge and wholly unsupported by the record"); *Harden v. Southwark Metal Mfg. Co.*, No. CIV.A.99-4666, 2002 WL 31194220, at *7-8 (E.D. Pa. Oct. 2, 2002) (finding plaintiff could not meet burden to show pretext in race discrimination case, where when asked to provide examples of white employees who earned more money than he did, plaintiff "gave nothing but vague answers" that included incomplete identification information and no "concrete information" about key facts).

30

were "age neutral" and "insufficient to support an inference of [age] discrimination") (internal

quotation marks and citation omitted). For all of these reasons, the Court has no difficulty

concluding that the cited portions of Plaintiff's testimony provide Plaintiff with no significant

evidentiary support.[20]

The only other argument that Plaintiff points to in support is that he allegedly "was

terminated solely for [a violation of the no call/no show] policy that all the evidence of record[]

proves he did not violate." (D.I. 34 at 15) Even assuming that the evidence of record in support

of this argument could provide the requisite inference of age discrimination necessary to satisfy

the fourth prong of an ADEA *prima facie* case, for all of the reasons set forth above in Section

III.A.2, *supra*, the Court finds that it could not support a finding that age discrimination was a

"but for" cause of the adverse employment action here.

As a result, and with Plaintiff having presented no other direct or circumstantial evidence

to indicate that age was a factor in his termination, the Court recommends the grant of summary

judgment as to the ADEA claim.

### C. FMLA Claim

---

[20]     Defendants, for their part, cite to record evidence stating that 68 of the 86
employees in Plaintiff's department were over the age of 40, (Schandelmeier Aff. at ¶¶ 19-20),
that the individuals primarily involved in Plaintiff's termination were all 40 or older, (*id*. at ¶¶
11-12; D.I. 33, ex. A at 27), and that Plaintiff was over 40 when he began his employment with
Defendants, (D.I. 1 at ¶¶ 11, 15). (D.I. 31 at 15-16) Defendants then cite to a number of cases,
all from outside the Third Circuit, standing for the proposition that these facts may be relevant
when analyzing whether a plaintiff has sufficiently established a *prima facie* case and/or pretext
for an ADEA claim. (*See* D.I. 31 at 15-16) Yet what is more important—both in this case and in
the cases cited by Defendants—is whether, on the whole, a plaintiff presents probative evidence
demonstrating a "factual scenario [ ] compatible with discriminatory intent" and that the
proffered reason for termination is unworthy of credence. *Ashley*, 869 F. Supp. 2d at 552
(internal quotation marks and citation omitted). As demonstrated above, Plaintiff failed to
present such evidence here.

31

The FMLA provides that it "shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the FMLA]." 29 U.S.C. § 2615(a)(1). "'In order to assert a claim of interference, an employee must show that [h]e was entitled to benefits under the FMLA and that [his] employer illegitimately prevented [him] from obtaining those benefits.'" *Pellegrino v. Commc'ns Workers of Am.*, 478 F. App'x 742, 745 (3d Cir. 2012) (quoting *Sarnowski v. Air Brooke Limousine, Inc.*, 510 F.3d 398, 401 (3d Cir. 2007)). In order to make out this claim, the employee needs to show that he "was entitled to benefits under the FMLA and that he was denied them." *Callison v. City of Phila.*, 430 F.3d 117, 119 (3d Cir. 2005).

The FMLA also has a "retaliation" provision, which provides that "[i]t shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by" the FMLA. 29 U.S.C. § 2615(a)(2). To prevail under this provision, a Plaintiff's claim based on circumstantial evidence must be established pursuant to the *McDonnell Douglas* burden-shifting framework discussed above. *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 301-302 (3d Cir. 2012). As to an FMLA claim, in order to set out a *prima facie* case of retaliation, a plaintiff must point to evidence of record sufficient to establish that: (1) he invoked his right to FMLA-qualifying leave; (2) he suffered an adverse employment decision; and (3) the adverse action was causally related to his invocation of rights. *Id.*

The Third Circuit has further explained the law regarding these two types of FMLA claims this way:

> Although neither provision [the interference provision or the

32

retaliation provision] expressly forbids employers from terminating employees "for having exercised or attempted to exercise FMLA rights," a Department of Labor regulation has interpreted the sum of the two provisions as mandating this result. *See* 29 C.F.R. § 825.220(c). Under this regulatory interpretation, employers are barred from considering an employee's FMLA leave "as a negative factor in employment actions such as hiring, promotions or disciplinary actions." *Id.* Accordingly, an employee does not need to prove that invoking FMLA rights was the sole or most important factor upon which the employer acted.

*Lichtenstein*, 691 F.3d at 301 (internal citations omitted).

With regard to the interference claim, Defendants argue that Plaintiff cannot prevail, because he freely used and exhausted his FMLA benefits over two months prior to his termination. Thus, they claim, at the time of Plaintiff's termination he was no longer entitled to FMLA benefits (and could not have then faced "interference" from Defendants that prevented him from using such benefits). Indeed, the record demonstrates that Plaintiff exhausted all of his available FMLA leave by March 28, 2011, well before the date of his termination. In his deposition, Plaintiff acknowledged that he used all of the FMLA time he was entitled to with regard to his 2011 leave of absence, and that he knew that he had. (D.I. 33, ex. A at 74) When asked what evidence he had to support this interference claim, Plaintiff could not recall making the claim, and said that he "can't remember" if any such evidence exists. (*Id.* at 73)

In his answering brief, Plaintiff does not dispute Defendants' argument, makes no substantive response to it, and fails to suggest any theory under which his FMLA interference claim is viable. (D.I. 34 at 19) Under these circumstances, the Court recommends that Defendants be granted summary judgment on the claim. *See, e.g., Szostek v. Drexel Univ.*, Civil Action No. 12-2921, 2013 WL 6667746, at *8 (E.D. Pa. Dec. 18, 2013) (granting summary

33

judgment to defendant regarding claim of FMLA interference where plaintiff did not dispute that when plaintiff's employment was terminated, he had taken and exhausted his twelve weeks of FMLA leave); *Moore v. U.S. Foodservice, Inc.*, Civil Action No. 11-2460, 2013 WL 5476405, at *8 (D.N.J. Sept. 30, 2013) (same); *see also Karaffa v. Montgomery Twp.*, Civil Action No. 12-1184, 2013 WL 1157626, at *4 (E.D. Pa. Mar. 21, 2013) ("As an initial matter, [plaintiff] cannot maintain an interference claim based on her leave of absence to recover from the injuries caused by the car accident because that leave was not protected under the FMLA, as [plaintiff] had exhausted her FMLA leave prior to the accident.").

With regard to Plaintiff's retaliation claim, Defendants assert that Plaintiff cannot meet his burden as to the third prong of the relevant *prima facie* case (showing that "the adverse action [his termination] was causally related to his invocation of rights [under the FMLA]"), nor demonstrate that their proffered reason for his termination is a pretext for FMLA discrimination. Defendants' position here is similar to their position as to Plaintiff's two other claims—that the reason for Plaintiff's termination was that he "failed to comply with the no call/no show policy[,]" and that Plaintiff cannot sufficiently demonstrate otherwise. (D.I. 31 at 19) Defendants also note, *inter alia*, that Plaintiff confirmed at his deposition that no one working for Defendants ever communicated to him in any way that his use of FMLA leave was negatively viewed by the company, and that he never saw anything in writing from Defendants to that effect. (*Id.* at 20; D.I. 33, ex. A at 75-76)

Plaintiff, for his part, also focuses on the same main argument highlighted as to his earlier two claims: that he "did not violate" the no call/no show policy, and Defendants' use of that

reason to justify his firing demonstrates that he has a viable claim for trial.[21] (D.I. 34 at 19)  As

Plaintiff's argument here is no different than the argument he presented as to his other two

claims, it fails here for the same reasons explained above.  Accordingly, Plaintiff cannot, at a

minimum, meet his burden to establish that Defendants' legitimate non-discriminatory

explanation could be reasonably viewed as a pretext for FMLA discrimination.

The Court therefore recommends the grant of summary judgment as to Plaintiff's FMLA

---

[21]     Although Plaintiff does not raise this argument, the Court notes that temporal proximity between a plaintiff's FMLA leave and his termination may be sufficient to create an inference that a causal link exists between these two events, thus satisfying the third prong of the *prima facie* case for an FMLA interference claim. *See Lichtenstein*, 691 F.3d at 307.  For example, in *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294 (3d Cir. 2012), the Third Circuit concluded that where the plaintiff was terminated just seven days after invoking her right to FMLA leave, the temporal proximity between these two events was sufficient to create a causal link in the *prima facie* stage. *See id.* at 307 (vacating the district court's grant of summary judgment for defendant and noting that "[a]lthough there is no bright line rule as to what constitutes unduly suggestive temporal proximity, the temporal proximity in this case is in the realm of what this Court and others have found sufficient at the prima facie stage") (internal quotation marks and citations omitted).  The facts here are distinguishable, in that Plaintiff appears to have invoked his right to FMLA leave approximately six months before his termination and was permitted to use his full period of FMLA leave, which ended months before his termination. (D.I. 33, ex. A at 34, 73)  Then, prior to Plaintiff's expected return date, Defendants initiated a phone call with Plaintiff in which Defendants' representative provided Plaintiff with a phone number to schedule an FFD evaluation. (*Id.* at 66-67)  These facts bare a closer resemblance to cases where courts have found insufficient evidence of causation with respect to the third prong of a *prima facie* case. *See Rumanek v. Indep. Sch. Mgmt., Inc.*, —F. Supp. 2d —, Civil Action No. 12-759-SRF, 2014 WL 104966, at *3, *11 (D. Del. Jan. 10, 2014) (no finding of causation where the plaintiff requested and received FMLA leave, returned to work approximately three months later and was terminated six days after that, where "[n]o other evidence" suggested retaliatory motive and there was evidence that defendant expected plaintiff to return to work and had made preparations for plaintiff's work to resume); *Bracy v. Melmark Inc.*, Civil Action No. 12-3323, 2013 WL 5330147, at *2, *10 (E.D. Pa. Sept. 24, 2013) (no finding of causation where the plaintiff requested and received FMLA leave, returned to work approximately two months later, but was terminated three days after returning to work, where "the proffered evidence, as a whole, does not suggest Plaintiff was terminated for taking FMLA leave").  Without any argument to the contrary from Plaintiff, the Court determines that under the circumstances here, any facts regarding the timing related to Plaintiff's FMLA leave and termination are not sufficient to alter the Court's ultimate conclusion as to this claim.

claim.

## IV.   CONCLUSION

For the reasons set forth above, I recommend that Defendants' Motion for Summary Judgment be GRANTED.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1) and D. Del. LR 72.1.  The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b).  The failure of a party to object to legal conclusions may result in the loss of the right to *de novo* review in the district court.  *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the District Court's website, located at http://www.ded.uscourts.gov.

Dated:  March 28, 2014

Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE